Based on the document 2-17-0949, Michael L. Cleland, Bruce C. Cleland, Barbara C. Messier, Stephen M. Clew, plaintiffs' attorneys, Mr. John E. Cleland, Diana D. Cleland, and Jared W. Cleland, defendants' attorneys, arguing on behalf of the plaintiffs' attorneys, is Amy Lynn Silvestri, arguing on behalf of the defendants' attorneys, Mr. Tyler B. Slatton. Ms. Silvestri, you may proceed. May it please the court, counsel, as your honors already are aware, this has been an interlocutory appeal from rural county with regard to two claims that were dismissed pursuant to a 619 motion. In reviewing the matter, bringing the matter before the appellate court, there are two overriding issues that plaintiffs are claiming. First is an improper application of the 619 standards before the trial court, and the second general issue is a misapplication and misunderstanding of both the doctrine of election and equitable assemble. In looking at the first issue that was raised by plaintiffs in their brief on appeal, as your honors are aware, there were a distribution from a trust subsequent to the death of the second parent of the parties. This distribution of the trust, the defendants are saying, prevents my clients from proceeding with a dispute concerning the validity and possible rescission of that trust agreement. As raised in the court below, the court focused quite a bit on the source of the fines, and under a 619 motion, of course, the court's not permitted to, at the trial court level, at a 619 proceeding, make a factual determination, weigh out the facts and say, oh, I like your facts better than yours. Well, I think the court's allowed to make findings as to easily proven facts. That would be correct. And I think your argument should be better directed at, these aren't easily proven facts. These are essentially the ultimate facts. I would agree, your honor. Thank you. Well, the plaintiffs did set forth, immediately preceding, at page 12 of their brief, they set forth, and they brought this to the trial court's attention, there were a set of deposits into the account, which was Louise Trust's account. There was a set of deposits immediately preceding the distributions, which exactly equaled the six distributions. Down to the penny. I'm sorry? Pretty much down to the penny. Down to the penny. The court's comment to that was, well, you guys are making too much of that. You make much of the identical deposits and distributions. That flies in the face of the standard of 619. We've set forth, these are the documents, these are the deposits, down to the penny, they equal. And interestingly enough, not only is it down to the penny, but it's not even like an even amount. I mean, it's $187,204.26. That's the total of all six. That's the total of all six distributions. I think it's more than mere coincidence or making too much of the fact that these deposits equal down to the penny to 26 cents, the same exact amount of these distributions. Well, with regard to the distributions, the defendants admit in discovery and answers to interrogatories that they withheld the $200,000, correct? That is correct. And that was not disclosed to my clients until after these distributions were made. So you would say even if the Doctrine of Elections applied to trust, that would take it outside the Doctrine of Elections because the fraud exception would apply? That is correct. Yes, that is correct. That is one of our arguments. Other thing as far as these deposits. If there was money still being held for distribution, does the Doctrine of Elections relate only to partial distributions as opposed to a final distribution? I would posit that looking at solely did you receive a distribution under the trust goes more to the Doctrine of Equitable Settlement. I think with the Doctrine of Elections, you also have to look at the aspect of was there competing... Maybe I should phrase it in a slightly different way. How can one make an election when one isn't fully apprised of the facts? And one of the facts is that there's still $200,000 yet to be distributed. And until you know whether or not you're going to get all or none or some of it, how are you electing anything? And that is one of our issues when it comes to the fraud. When the depositions and the information that has been submitted and is part of the record indicates that Jerry and John Cleland, the defendants, specifically knew that they were going to withhold $200,000 prior to making these distributions. The sequence of events was family meeting where my clients expressed some concerns, discontent, distributions are made, and then about a month and a half later, oh, and by the way, there's $200,000 left in the account. My clients are, whoa, what's happening? Now, in the interim, there's also a written communication from Jerry Cleland saying, we estimate you guys are going to get each about $30,000 out of Mom and Dad's estate. But that's less than half of the amount, right? It is less than half. They distributed less than half of the cash funds that were in the trust estate. That is correct. And this was not, again, not disclosed until, and it was never directly disclosed. It was disclosed when my clients received the checkbook registers from. Philosophically, is there any reason to apply the doctrine of election to trust? I've noted it's when there's a will substitute, when it's a will substitute. And I think that the distinction that we've raised in this, so I do believe that there are some trusts that truly are will substitutes, because the definition of that is where the ownership of property basically transfers, or the rights to the property transfers upon the death of whoever created the trust document. I do believe that that would apply. But in this particular situation, the distinction that clients have raised is that upon the death, actually upon the death of William, who died three years, two years, three years before Luis, his property still continued to remain in the trust. His, the real estate and so forth. And then upon Luis's death, that property continued to remain in the trust. They had an ongoing operation. And I think in your brief you said it could last for up to 17 years? Under the 2012 trust agreement, that is correct. It allows the continuing operations to last up to 17 years. And then what would happen after the 17 years? All six kids are equal beneficiaries. Would get a split. Right. They're all to receive equal amounts. And that's consistent as well with all the versions of the trust. And I put it on page 22 of the initial brief. You know, really the difference between the various versions of the trust is that the manner in which, John Cleland's the one who has the option in all the trusts to receive the real estate. But the manner in which he receives it is different. So that's a really important factor from our perspective. Because it's not saying there's no difference in the ultimate everybody, the six kids get their share. It's how does that get implemented. And I think that's similar to actually kind of like a birth case. You're looking at, well, it's not the dispute that arose, the Boyer 2 decision from the Supreme Court. The dispute that arose did not affect the ultimate distribution. So the ultimate distribution is with the six kids. But it's how is that implemented. That's the distinct, those are the changes that were made in the various trusts. Well, and there's a difference between what's being distributed though, isn't there? Because it doesn't, one of them give him the opportunity to buy at 80% of value. Well. And the other, the previous one was 90% or something, right? Is that right? The value is, initially it was two years at 80%. Then it jumps down to 70%. Yeah. Okay, 70%, that's right. There's three different versions. And it progressively changed, but the most recent was a very drastic change. So ultimately in dollars it may or may not, depending on value of land and so forth. But ultimately the distribution between the six is the same. But going on that issue, looking at the document of election, the document of election doesn't just, you have to show that there's an inconsistent or alternative claim to property. And that's not at all what's happened in this case. Everybody knew they were all entitled to some of the funds. Everybody knew they were entitled to one-sixth. And everybody knew that John was entitled to have these options to take the land. Everybody knew that. Did they know that he was going to get 48 years for free? Not to the last provision. Not to the last provision. But did the siblings, though, have knowledge of that fact? Well, they had received a copy of Louise's trust. Now, they had located, excuse me, they had located a copy of Williams, but they were unsure what the version was that John and Jerry Cleveland were intending to proceed under. They were claiming that that was the one. There are some differences between what's interesting there, and I pointed this out in the brief as well, is between the version that John and Jerry Cleveland presented and the copy that was presented for my clients. There's a difference on placement of signature, placement of the notary. So there appears to be two different signed copies. There's also differences. Defendants had indicated that the attorney had submitted a letter saying, well, Williams is exactly the same as Louise's, but that's not true. There's differences on the names of the trustees. There's also differences on how Williams says the remaining property. I'm sorry. One of them says the remaining property. The other says just the property of the trust remains in the trust. So there are some differences, and those have been pointed out in the brief as well. Were these copies that your clients had obtained or were given to them before or after the first distribution, which I believe was the basis for the court's finding that there was an election? The Louise, yes, was given to them, and they had located the one version of Williams Trust. And was the distribution an either-or situation? I don't believe so. If I understand your question correctly. It was not presented in a letter, take this or else. No, it was not. The letter was presented by, hey, here's the check. And, in fact, it said something to the effect of, we're sure Mom and Dad would be happy you had this money, so forth. And there was a communication sent with that letter, which is noted in the brief. Who was that from? Jerry Cleland. Yes, Jerry Cleland sent that. And that also, the amount of the check coincided with the prior communication, which was saying, hey, we're estimating everybody's going to get approximately $30,000. But, again, now we're looking at, well, was there a fraud? If the document of election applies, we're looking at if there was a fraud exception. And, again, the court below looked and made a determination on the merits. There's been, we presented several different issues that we have, saying my parents were not fully informed. But yet the court disregarded that and said, hey, too bad. You took the money and the story. But I don't think that the, even in the Volga case, which I know you're familiar with, the court did note that the power of attorney that was at issue there, there was an issue of whether or not it was lawful or not. And the court specifically said, we're not going to determine the merits. However, we will say they've raised enough of an issue that it could be an exception. There's an alternative set of facts, including the trial court fact, that would warrant relief for your clients. Correct. And that's where one of the biggest complaints that my clients have is that the trial court below went beyond. I mean, my clients presented possible facts that could entitle them to relief. And the court dismissed it. Outright said, no, we're going with the defendant's version. That's my time. Okay. Thank you. Mr. Slack? Yes. You may proceed. Good morning. Morning. May it please the court, counsel, Tyler Slack for the defendants, John Cleland, Jerry Cleland, and Diane Cleland. And I want to start off by making sure that your justices, that we have the record clear, okay? And I want to go over just a few things as far as the timeline, because there were some things stated in the opening remarks. It's undisputed from the record that the plaintiffs had copies of both trusts as early as January 20th, between January 20th and 23rd of 2015. That was shortly after Louise Cleland died. After she passed. Yes. The cash distributions did not come until April of 2015. In that timeframe, there were other communications to plaintiffs, okay, regarding the provisions of the 2000s in trusts, regarding the 2012 trusts, and regarding other matters. Most notably, and this is noted in Judge Young's opinion, he placed importance on it, the March 17th, 2015 letter from Attorney Lois Ramon to the plaintiffs, which there has been no dispute that all of them received it. And that was attested to in the Jerry Cleland affidavit attached to our motion to dismiss. That letter, as we cited in our brief, goes into detail about the provisions of the trust, about what was to go to John Cleland, the 40 acres on the top, the 70% market value, in detail, okay? In addition to that letter, there were text messages between our clients and the plaintiffs. Did that letter provide notice that $200,000 was being withheld? It provided that certain amounts of funds need to be withheld for the purpose of continuing to farm the farmland, because the trust provides that that farm income off the land will be distributed to each one of the plaintiffs at the end of every year. Our client, John Cleland, is a farmer. There needs to be money for inputs, fertilizers, seeds, that type of thing, in order to continue to farm the land. Does all the income from the land go into the trust? Yes, and then it's distributed to the plaintiffs, which goes to the trust documents. There's no fraud in this case. That was set forth in her letter very clearly. And in addition to that, our clients attempted, as evidenced from the text messages that are in the record, again, those texts were sent in March, and in email. They wanted to set up a meeting where Lois Ramon could be present. That's, again, the estate planning attorney. And she could answer any questions they had. The plaintiffs didn't want her to be present. Was there any language in this letter? What page of your appendix is that letter at? May I read my appendix real quickly? Sure. Well, Your Honor, it's going to be attached to Jerry Cleland Affidavit, which was submitted in September 2015. It was an exhibit to that affidavit. I think it's 104. Is that correct? That may be correct, Your Honor. I have it right in front of me. The affidavit of Jerry Cleland is attached in our appendix in A29. And then it references this letter as Exhibit 9 to the affidavit. So it's Jerry Affidavit, Exhibit 9. It's the Lois Ramon letter. And, Your Honors, that affidavit was filed with a motion to dismiss. And regarding the source argument, it stated in paragraphs 21 and 22 exactly that the cash distributions came from both trusts and that the personal property also came from both trusts. There was never any sort of counteraffidavit filed by a plaintiff contradicting those statements. This is despite the fact Judge Young allowed plaintiffs discovery on the 619 motion before they had to file their response. Plaintiff's counsel was allowed to depose Jerry Cleland, ask him about, well, where did this money come from? Where did the personal property come from? She could get to the foundation of that. If you look at the deposition testimony, there's nothing inconsistent with his statements. And she doesn't cipher that deposition because there's nothing that contradicts his statements in the affidavit. She didn't file a response to the motion to dismiss until December of 2016. Plaintiffs had over a year to put into the record any sort of affidavits, any sort of evidentiary materials, deposition transcripts that are going to contradict anything in Jerry Cleland's affidavit. There's nothing in the record to contradict it. Did the trial court grant the motion? Grant the motion to dismiss, yes. And it did so on what basis? On the basis of doctrine of election and on the basis of equitable style. So how would any affidavit filed by your client establish the nature, the character, and the extent of your opposing parties and the possibility or probability that they actually made an election? Well, it discusses, first of all, documents, communications that were sent to them that would go to their knowledge, including the Attorney Ramone letter. And it also talks about the source of the benefits that they received well prior to filing any sort of trust challenge. They didn't file the complaint until July. They received the cash distributions in April, and they started receiving personal property back in February. They never offered to return those benefits. They never returned the check or offered to return the check. Is it an either-or? What do you mean? What do you mean by that? Would they have to do that? Would they have to return that distribution? They're certainly case law. And from this court, from the Second District, I refer this court to the Kiker case, which is talked about in the Volga case, in the Second District case in Volga, and the Supreme Court's decision in Boyer that discusses the need to return that prior to actually filing your contest. And if you don't... And that's if you're contesting it, right? Yes. What if you're actually seeking to enforce it, the terms of the trust? Is that what they're doing here, or are they... Well, they're not. They're seeking to invalidate the 2012 trust, and that is what our clients have been administering. And that is based on what? And they're seeking to invalidate that on allegations of undue influence and lack of capacity. And do those raised issues affect their allegations? Well, it's defeated by the affirmative matter of the doctrine of election and equitable estoppel. That was raised in our 619 motion. Certainly, we haven't... I mean, those are affirmative bars, and the case law is pretty clear on that, that they can be raised by a 619, as they were in Kiker, Second District case, Jaffe, and Ting. Why do they have to make an offer of refund if, in the trial court, using its solemnness of wisdom, rules that in order for them to prevail and receive the fruits of a judgment favorable to them, that either there is an offset in the amounts in question that was made in the first distribution or that they actually refund the money? I'm not saying that... I want to be clear. I'm not saying that they have to make an offer of refund. I'm referring specifically to Kiker, which talked about that, okay? Well, it sounds like they're saying it's a sine qua non, and since they didn't do it, they obviously elected something. And the election was they elected to supposedly capitulate. They elected to take one banana instead of the entire bunch. That is my position. And they did elect to do that because they had knowledge of the operative document. They knew that these trusts were in place and that defendants were administering these trusts. They had the trusts in their possession as early as January. What was inconsistent in the trust, or was there an alternative claim to property in the trust that meant that accepting this check meant you're out for the rest of the property? Well, I think that... There's certainly nothing in the correspondence that says this is the final distribution, accepted or else. Well, as far as the substantive provisions, I think Justice Spence did touch on the fact there was a difference between the prior trust documents and the 2012 trust documents about the fair market value. That's necessarily going to be a difference in the substantive property. Yeah, ultimately. But I also wanted to highlight the fact that the Supreme Court in Boyer, citing a number of historical cases, Schlemy, Oglesby, Raneyard, talked about alternative claims, not necessarily alternative benefits. The alternative claims in this case are the claims under the 2012 trust versus claims under a prior trust in Tennessee. And there's a long line of cases detailed in our brief Supreme Court cases referenced by Boyer that talk about alternative claims, not necessarily alternative benefits. The Supreme Court said in Boyer that the doctrine of elections has fallen into disfavor, correct? Well, the Supreme Court said that, but we've cited three appellate court opinions, one of them being a second district opinion, Kiker, that applied the doctrine. So the Supreme Court may not have... Did Kiker apply it to trust? They didn't apply it to trust, no. It was only once. And there's only one case that you cite out of the first district that's applied it to trust, correct? Yes, it was the Boyer 1 opinion applied it to trust. The Supreme Court did not overrule that. No, they said they didn't have to reach that issue. And this Court didn't overrule it. It didn't address it either. And so that's the case that we cited. The plaintiff argues that BOGA supports their position, that there is an alternative set of facts here that would have supported their position. I don't believe BOGA applies. I think it can be easily distinguishable that it was a challenge to a trust amendment based on a power of attorney that did not comply with statutory requirements. And the amendment was not even prepared by the settler. It was prepared by a trustee. And I know you're familiar, Justice Burkett, you've authored the opinion, that it was authored by a trustee beneficiary. It had nothing to do with the settler's intent of the actual property distribution. The Supreme Court in Boyer talked about the underlying principles of the doctrine of election. One of them, honoring the settler's intent as to property distribution. Well, that didn't have anything to do with the settler's intent in BOGA because it had to do with that trust amendment. Furthermore, Your Honor, and this is in the record, the trial court order in BOGA that applied the doctrine of election, it was basically four sentences that only said that the motion is granted. It didn't identify the alternative claims or the benefits, and I know that you're familiar with this. This court had no choice but to say that the court had gone too far in that case. Contrast that with Judge Young's opinion in this case. He has about a 20-page transcript of his findings detailing the alternative claims and also the timeline. I think the timeline is so important. Are you addressing the argument that coincidentally the figures are exactly the same as the distributions? My response to that is why does it matter? It's undisputed that there were funds in that account. Which were useless. Yes, and it's undisputed that some of those funds came from Tracy Cleveland rental payments, which is property owned by both trusts. It doesn't matter whether or not it's coincidental or whether or not they match up because there were already funds basically in the pot. You've got a pot of water. You pour a glass of water in there. It's mixed. You pour that back out into the glass. You can't identify specifically what was in the original glass of water. So all of the funds that were dispersed were from Louise's trust? No. They were from the cash payments came from both Williams' trust and Louise's trust. It came from one checking account that was in Louise's trust's name. This is a matter of convenience. And that was testified by the accountant. Rather than writing two checks for two different accounts, he just put it into one pot. You raised equitable estoppel. Yes, Your Honor. Usually an estoppel arises based upon the evidence of some act or acts that the other parties did. And so I'm curious, what did they do that supposedly relied upon to your prejudice and therefore they should not be allowed to recant, withdraw, or abrogate whatever they did? The case law, Your Honor, I believe in Boyer, in the Supreme Court's ruling in Boyer, I believe, and in FOGA, doesn't discuss any sort of reliance. It discusses taking inconsistent positions, whether that's they cite the cases where you involve in a statute or making claims under a statute or under a divorce decree, and that you cannot basically challenge a document while at the same time receiving benefits under the document. So I don't believe that reliance or prejudice needs to be shown in order to assert that defense. Well, your argument about the water and pouring it in suggests to me that I don't know how you could rely on what they did if supposedly they contaminated the pool in some way. If you supposedly put something in the pool, either it's contaminated or it's not. If you supposedly are taking amounts out of the pool, unless the pool is diminished, which it isn't insofar as the provisions that are in contest, I don't see how they're mutually dependent such that your reliance on the acceptance of the payments supposedly prejudice you in some way when one is not an element of a syllogism, when one is not a sine qua non that indicates that if you accept this, then this will happen and this happening will prejudice my client because it will be a different situation than from something else. Whether or not there's a distribution of personal property or money, how does that affect whether or not your client is entitled to 40 acres or 70% assessed value or 80% assessed value? How is it that one is so dependent on the other that by accepting the money, that they supposedly are putting themselves in the shoes of concrete and they can't get out? Justice McClaren, I think the case law is clear that the doctrine of election is based on this idea that you cannot pick and choose what the seller is intending to distribute. We're going to take this, but we're not going to respect the rest of the document, even though we've had knowledge of the document. We've had it in our hands for months now, but we're going to accept these benefits, but these other parts, those are not valid. Were these people entitled to this distribution before the 2012 restatement documentation that existed then? Point being that you haven't explained to me how what they took was different from what they were originally allowed to take in the first documentation or the first trust that was supposedly prepared versus the 2012 trust agreement or trust declaration. So if what they accepted was consistent with any of the restatements, including your own, then how is it that they're inconsistent when they're consistent with what was before and they're consistent with what you said now? I'm glad you raised this question, and I am failing to recite how Judge Young addressed this argument at the trial court level, and he stated that he could not speculate what they were going to receive, and that is consistent with Jonathan, Kiker, and King. Regardless of what Judge Young said, our review is de novo. You know that. Say that again? Our review is de novo. Yes. So we don't really examine what Judge Young said. Okay. Then I would refer your Honor to the cases of Kiker, Jaffe, and King, which said that the trial court cannot speculate as to whether or not it was going to be the same distribution they got or not. And as noted in our brief, not all of the trust documents are included in the record. And that was Judge Young's response at the trial court level. He couldn't speculate whether or not they were going to. There could have been a change in benefits. My last question to you is the doctrine of elections in the limited cases where it's been applied to trusts is applied to trusts where the trusts are rule substitutes, where there is a distribution upon the death. Correct? Rule substitutes has been the key terminology. Right. How can it be said that the trusts in this case were rule substitutes where the trust did not distribute all of the trust assets upon the death of William and Louise, especially where the farm could be an ongoing concern for another 17 years? So you're referring to what happened after the death of William? Absolutely. And then Louise died later. Right. Well, how can you say that this is a rule substitute where there is no distribution of the farmland for possibly another 17 years? Because there's a vested right that after he has died, pursuant to the trust document, they receive certain rights under that trust document. That is somewhat of a distribution of property upon his death. It's not being sold right after he dies, but it's a vested right. The next question is by accepting the $30,000 and change payments, the plaintiffs would be out when the farmland is sold. Is that the contention? What do you mean by the claim? That they could not make a claim to any of the distribution or any of the revenue that results from the sale of the farmland. Well, there's an option to purchase that's available to our clients, so it would depend on whether. And where would that money go? Who owns the land to sell? The trusts. And who has the beneficiaries of the trust after they've accepted the election? Under the 2012 trust? Correct. What would be the beneficiaries? I mean, it would be the plaintiffs and our two clients. So they would still be entitled to receive distributions from the sale of the land 17 years from now. I think the option to purchase for our client is only seven years, but it would depend on whether that's going to be on 80% of the appraised value or 70% of the appraised value. But when he purchases it or obtains financing, the proceeds of that sale would go to plaintiffs and to the beneficiaries of the trust. So their election here is only a partial election. They're still entitled to make a claim towards the proceeds from the sale. Certainly. Under the 2012 trust, they would receive one-sixth of the proceeds of the sale. Then what did this election bar them from doing? It barred them. I mean, I think the case law is clear. They are basically accepting the document. They received the benefits before they filed their challenge. It might have been different if they had filed the challenge before receiving any benefits. But they have elected to take out of that trust document, and they are acknowledging its validity. I think that's clear from the case law. And knowledge is something that this court can look at, and that knowledge is set forth in Jarrett Cleveland's affidavit. That was never – I mean, those communications that show that knowledge was never contradicted. They had the trust. They had a letter from the attorney. They could have met with the attorney. They did meet with the trustees. They received an accounting on May 29th from the accountant showing the financial activity for both trusts. They didn't file their claim until two months after. Clearly, they knew this was the operative document. They accepted the benefit. They never tried to return them or offered to return them ever to this day. And the case law is clear that under that scenario, they have elected, and that the 2012 trust should be found to be valid and our claim should be allowed to administer. And we're asking that Counts 1 and 2 – that the trial court order dismissing Counts 1 and 2 of the prejudice be affirmed. Thank you. Ms. Silvestre, you may proceed. Thank you. I want to point out the letter of Lois Ramon that was made much ado of by Attorney Slack, the March 17th, 2015 letter. In the record, it's page C-1304, which is the page I'm referring to in the plaintiff's appendix. It's A-135. The question was, was it disclosed to my clients that $200,000 was being withheld for farming expenses? The sentence in this letter reads, the trust will retain sufficient funds to pay expenses such as funeral, other debts of Lois, trust administration expenses, and funds for payment of real estate taxes and other farm expense. Reading that would not automatically lead someone to conclude that more than half the funds are being retained for this farming operation. When you're looking at funeral expenses, administration expenses, you're not looking at $200,000. And in fact, the depositions of both John and Jerry Cleland specifically say they withheld that $200,000 to do this farming. This farming with John Cleland. And the other thing, Jerry Cleveland's affidavit is insufficient to establish my client's knowledge. Submitting an affidavit from a party saying, oh, the other side doesn't know anything, or they knew this and they knew that. Was there testimony in the record that prior to this litigation that there had been a good trusting relationship among the siblings? My clients submit, I've got these, Steve Cleland affidavit and Michael Cleland affidavit. Their position is, and I believe, it wasn't that direct, but their position was, it has been set forth, is when Louise died in January, there was a trusting relationship. They worked together. There's all sorts of text messaging, hey, let's go over and get the stuff. Okay, we're going to be there. In fact, some of these text messages, we're bringing pizza over. It was a cooperative event for all these siblings. Not all of them. Bruce Cleveland lives in Arizona, so he never came up. And Jerry didn't come over much because he's in the Chicago suburbs. But the rest of them, including John and Diane Cleveland, had a cooperative relationship, worked together to clean out the parents' home. Your position is to make it a valid election, if the doctrine of elections were to apply, the party should have known the amount that was being withheld. Yes, that is one of the factors. Yes, absolutely. And also the fact of the alternative claim. I mean, what alternative claim were they making to this property? That's never been established, never been detailed. There's no alternative claim that my clients have.  Attorney's site would leave one to believe that there's Jerry's affidavit, and that's it. End of story. I have Michael Cleveland's affidavit, Stephen Cleveland's affidavit. We have depositions of John and Jerry Cleveland, of David O'Brien. All these things go into the examination of the facts here. And it comes down to the trial court below looked at weighing out the facts and figuring out who was being, I don't know, more truthful or whose facts were better. But that's not the scenario. Now, granted, you can't just take completely crazy, unsupported facts that have no basis. You can't consider those. But there is a set of facts that my clients would be entitled to relief upon, and that prevents the entry of a dismissal under the 619 standards. It's a huge issue in this particular case, particularly with Williams Trust. I just want to address, too, the only money in the Louise checking account that really the defendants are hanging their head on that didn't belong to Louise is a Tracy Cleveland rent. I addressed this in the reply brief because this was raised by defendants in their brief. The Tracy Cleveland rent in Williams Trust, upon his death, there was a division into the family and marital trust of the property. Lois Ramone sent a letter, and this is all set forth in our reply brief, that there was no marital trust but only a family trust established. She also set a tax ID for the family trust and indicated that the assets were transferred. If I may finish one more sentence, per the family trust provisions, all income belongs to Louise, including the Tracy Cleveland rent. It's Louise's money. Any other questions? Thank you. Your time is up. We have another case in the call. There will be a short recess.